IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Cody B., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:17-CV-2601-D-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are the *Plaintiff's Brief*, filed December 26, 2017 (doc. 17), *Defendant's Response Brief*, filed January 29, 2018 (doc. 20), and *Plaintiff's Reply Brief*, filed February 2, 2018 (doc. 21).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND

Cody B. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act (Act).  (docs. 2; 17.)

A.    **Procedural History**

On November 26, 2013, Plaintiff filed his application for SSI, alleging disability beginning

on October 29, 2013. (doc. 14-1 at 16, 89.)[1] His claim was denied on July 1, 2014, and upon reconsideration on October 22, 2014. (*Id*. at 87, 102.) On October 31, 2014, he requested a hearing before an Administrative Law Judge (ALJ). (*Id*. at 116.) He appeared and testified at a hearing on January 19, 2016. (*Id*. at 47-66.) On April 22, 2016, the ALJ issued a decision finding that he was not disabled and denying his claim for benefits. (*Id*. at 11-42.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on May 5, 2016. (*Id*. at 152.) The Appeals Council denied his request for review on July 13, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* docs. 1-2.)

B.    **Factual History**

    1.    **Age, Education, and Work Experience**

Plaintiff was born on July 7, 1991, and was 24 years old at the time of the hearing. (doc. 14-1 at 41, 49.) He had at least a high school education and could communicate in English. (*Id*. at 41.) He had no past relevant work experience. (*Id*.)

    2.    **Medical Evidence**

On March 18, 2013, Plaintiff was treated in the emergency room of the Texas Regional Medical Center (TRMC) for an elevated blood sugar level of 477. (*Id*. at 585.) His face was flushed, he was talking non-stop, and his gait was slightly unsteady. (*Id*.) It was noted that he had been non-compliant with his medication, and that he had experienced similar episodes in the past. (*Id*. at 588.)

From May 28, 2013 to June 1, 2013, Plaintiff received treatment at Solace Counseling

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(Solace) for his drug use. (*Id.* at 399, 405-06, 411, 414-16.) He was discharged after completing all but 20% of his detoxification; he did not have any suicidal or homicidal ideation. (*Id.* at 399, 414-16.) From August 20, 2013 to August 24, 2013, Plaintiff again received treatment at Solace for his drug use. (*Id.* at 375, 380-81, 389-93.) He was discharged after completing his detoxification, and did not have any suicidal or homicidal ideation. (*Id.* at 375, 389-93.)

On October 20, 2013, Plaintiff arrived at the emergency room of Green Oaks Hospital (Green Oaks) after a suicide attempt. (*Id.* at 247, 269, 271.) It was noted that he was a long-term heroin addict, which he used intravenously, and he reported that he attempted suicide because he was tired of heroin withdrawals. (*Id.* at 267, 269, 271.) He had very high blood sugar. (*Id.* at 267.) He was eventually given medication for withdrawal symptoms and discharged. (*Id.* at 273-74, 278, 282.)

On October 24, 2013, Plaintiff returned to Green Oaks complaining of a mood disorder and seeking help to detox. (*Id.* at 244-45.) He was alert and responsive, with no suicidal thoughts, and reported last using heroin on October 19, 2013. (*Id.* at 244.) He reported that he was addicted to heroin but wanted to stop using it. (*Id.*) Fatema Willis, M.D., found that Plaintiff was fairly cooperative, attentive to his appearance, oriented times 3, and had normal psychomotor activity, dysphoric mood, constricted affect, intact memory, organized thought process, partial insight and judgment, and no hallucinations or delusions. (*Id.* at 247-48) He was discharged on October 25, 2013. (*Id.* at 265.)

On October 29, 2013, Plaintiff saw Andrew Bayat, M.D., at the University of Texas Southwestern Medical Center (UTSW), with complaints of a headache that had lasted for four days. (*Id.* at 326.) He had first noticed the headache when it woke him up, and he had pain all over that was about a 4 or 5 on the pain scale. (*Id.*) The pain was worse with bright lights and not alleviated by anything. (*Id.*) His headache seemed to worsen, and he had "malaise, weakness all over, nausea,

3

decreased appetite, vomiting x4, chills, and neck stiffness." (*Id*.) He denied having a "fever, sweats, hematemsis, diarrhea, constipation, or joint pain," and he had no chest pain, palpitations, loss of consciousness, or focal weakness. (*Id*.) A CT scan showed "[m]ultiple ill-defined mass like regions of low-attenuation throughout his brain." (*Id*. at 329.) An MRI showed "[s]cattered ring-enhancing masses with extensive leptomeningeal and ependymal enhancement" and "[m]ild enlargement of bilateral temporal horns . . . ." (*Id*.) He was found to have multiple brain abscesses, and a lumbar puncture that was notable for significant pleocytosis. (*Id*. at 331.) He was started on antibiotics. (*Id*. at 329.)

Plaintiff received treatment at UTSW for his brain abscesses on November 12, 2013, and November 18, 2013. (*Id*. at 299.) He initially underwent left frontal external drain placement and stereotactic cerebellar abscess drainage, and subsequently underwent right temporal abscess drainage. (*Id*.)

On February 4, 2014, Plaintiff presented to Parkland Hospital (Parkland) complaining of hypoglycemia. (*Id*. at 288.) He was nauseous and vomited. (*Id*. at 289.) It was noted that he had a history of type one diabetes and two brain/spinal cord abscesses, and that he was a former IV drug user with infective endocarditis. (*Id*. at 288.) He was also hyperactive and could not sit still during the interview. (*Id*. at 289.) Plaintiff reported that he drank a soda, ate a sandwich, took four glucose tablets, took his normal amount of insulin, and ate a normal breakfast and lunch. (*Id*. at 288.) He denied any fever, chills, cough, chest pain, or new neurologic symptoms leading up to this hypoglycemic event. (*Id*.) He also reported that this issue rarely occurred. (*Id*.)

On February 10, 2014, Plaintiff returned to Parkland because he had positive blood cultures. (*Id*. at 298, 299, 301.) He had an elevated blood sugar level of 580 and was admitted to start his diabetes medication regime again. (*Id*. 301.) It was noted that his recent hypoglycemia was likely

4

secondary to his non-compliance with his diet, or secondary to his drug abuse.  (*Id*. at 307.)  He was discharged on February 12, 2014, with no hypoglycemia, and with instructions to take Lantus two times per day and Aspart three times per day.  (*Id*. at 307-08, 344.)

From March 5, 2014 to March 9, 2014, Plaintiff received detoxification treatment at Solace.  (*Id*. at 356, 371-74.)  He experienced withdrawal symptoms during his treatment but did not have suicidal or homicidal thoughts or ideation.  (*Id*. at 371-74.)  He improved and was medically stable when he was discharged.  (*Id*. at 356)  He sought treatment at Solace again on March 25, 2014.  (*Id*. at 350.)  His affect, mood, thought process, insight, judgment, appearance, and orientation were all appropriate.  (*Id*. at 352.)

On April 24, 2014, in his Function Report - Adult, Plaintiff reported that he had a "hard time coping with society, especially in the workplace." (*Id*. at 197.)  When he was under stress, he had "episodes of anxiety, confusion, and rage." (*Id*.)  He suffered from diabetes and could not tolerate heat, and neuropathy caused poor circulation in his legs and feet, which limited him to standing or walking "for no longer than 45 min[utes] at a time." (*Id*.)  Plaintiff spent time with others at group therapy four days per week from 10:00 a.m. until 12:30 p.m., participated well, and tried to keep his mind busy by drawing, painting, or watching television until he went to sleep around 9:00 p.m.  (*Id*. at 198, 201.)  He had no problems with personal care and could prepare his own meals, shop in stores, and do minor house work and "common chores." (*Id*. at 198-200.)  He went outside as little as possible, became anxious when he left his house, could not go out alone, and did not drive because he did not have a car.  (*Id*. at 200.)  He was able to pay bills, count change, handle a savings account, and use checkbooks and money orders.  (*Id*.)  He had problems getting along with family due to his anxiety.  (*Id*. at 202.)  He reportedly could not lift over 10 pounds without struggling; be on his feet for longer than 45 minutes; understand, concentrate, or follow instructions as well as he

5

used to; or get along well with others. (*Id*. at 202.) He also reported that he could walk up to a quarter of a mile before having to rest for about an hour, depending on the temperature and his blood sugar levels. (*Id*.) He followed written instructions very well but could not follow spoken instructions very well, and had problems with authority and taking orders. (*Id*. at 202-03.) He had previously been fired from a job after a verbal confrontation with his boss. (*Id*. at 203.) He did not handle stress or changes in routine well, and he feared staying away from home and meeting new people. (*Id*.) His medications included insulin, Neurotin, and Suboxone. (*Id*. at 204.)

On May 13, 2014, Plaintiff went to Parkland for a follow-up for his type 1 diabetes. (*Id*. at 439.) It was noted that he had a known history of non-compliance with his medications. (*Id*.) He reported numbness and tingling his feet, but denied having polyuria, polydipsia, polyphagia, chest pain, or shortness of breath. (*Id*. at 441.) He was awake, alert, oriented times 3, and had appropriate behavior. (*Id*.)

On June 2, 2014, Paul Patrick, D.O., conducted an internal medicine examination for Plaintiff at North Texas Independent Medical Examiners. (*Id*. at 417.) He complained of polyuria and polydipsia, blurred vision in his right eye, headaches, difficulty balancing, fatigue and weakness, and numbness and tingling in both legs. (*Id*.) It was noted that his glucose level had recently run from 200 to 300, that he took Lantus and Novolog for his diabetes, and that he experienced sharp headaches in the right temporal area and occipital area that lasted for about 10-15 minutes. (*Id*.) He had dizziness, fatigue, weakness, recent visual changes, allergies, muscle aches, back pain, headaches, muscle weakness, numbness and tingling in his lower extremities, anxiety, depression, bipolar disorder, and post-traumatic stress disorder (PTSD). (*Id*. at 418-419.) He also experienced swelling in his feet and an irregular heartbeat. (*Id*. at 418.) He had tenderness to palpation in his back; no edema, clubbing, or cyanosis; an unsteady gait and left leg-drop. (*Id*. at 420.) He was

6

unable to perform toe walking and squatting or heel walking, was unstable with hopping, and needed assistance with tandem walking. (*Id*.) Dr. Patrick opined that Plaintiff would be limited to sitting for a moderate period of 1-2 hours, standing for a short period of 30 minutes, walking a moderate distance of 3/4 of a mile, lifting moderate weight of 10 pounds, but that he could exercise fine finger control and use a cell phone. (*Id*. at 421.) He noted that Plaintiff's past medical history included type 1 diabetes, brain abscesses, IV drug use, subcutaneous abscesses, and a suicide attempt. (*Id*.) Also, Plaintiff had weakness in his right side from two brain abscesses. (*Id*.) Plaintiff underwent an x-ray on his chest that same day and the results were normal. (*Id*. at 422.) Plaintiff's range of motion was also tested, and he had pain during flexion, internal rotation, and external rotation of his shoulders, and forward flexion pain in his hip. (*Id*. at 423-24.)

On June 3, 2014, Plaintiff underwent a psychological evaluation with Barbara A. Brucken, Ph.D., due to his depression. (*Id*. at 425-26.) He appeared frail and short of breath, admitted that he had low energy and fatigued easily, and his posture and gait appeared normal. (*Id*. at 426.) His symptoms of depression included feeling sad, night terrors, agitation, feeling worthless, poor concentration, and indecisiveness, but he denied having suicidal or homicidal thoughts. (*Id*.) He reported that he'd had depression since he was molested at summer camp when he was 9 years old. (*Id*.) He also stated that his father and mother were verbally abusive. (*Id*.) His night terrors began after his stroke, and he would feel irate and begin to sweat during them. (*Id*.) He was capable of bathing and dressing himself, doing some chores like vacuuming and cleaning, shopping, and managing money, but he did not cook; his grandmother reminded him to take his medications and helped him with his appointments. (*Id*. at 427.) Dr. Brucken noted that Plaintiff lived with his grandparents, had regular contact with other family members, attended narcotics anonymous (NA) meetings four times a week, belonged to an art club, and had adequate social skills. (*Id*.) She also

found that he should not have psychological difficulty completing tasks in a timely and appropriate manner. (*Id*.) She noted that Plaintiff last worked in September 2013, but that he could not work at that time due to his physical health. (*Id*. at 428.) Plaintiff was respectful, cooperative, and invested in the assessment; his thought processing was appropriate; his mood was depressed and affect was congruent; he did not have suicidal or homicidal thoughts; and he was oriented times 4. (*Id*.) Dr. Brucken opined that Plaintiff may have difficulty adjusting to changes in social, work, or personal circumstances, but that he should not have trouble with decision-making in those areas. (*Id*. at 429.) He was diagnosed with depression that was recurrent and severe without psychosis and heroin dependence that was in remission, and he given a Global Assessment of Functioning (GAF) score of 55. (*Id*.)

On June 29, 2014 and July 29, 2014, Dhiren Patel, D.O., completed psychiatric progress notes for Plaintiff at Solace. (*Id*. at 433, 435.) Plaintiff's mood was good, his thought process was normal, and he had reactive affect. (*Id*.) He had no psychotic symptoms, no anxiety, and no suicidal ideation. (*Id*.) His GAF score was between 41-50. (*Id*. at 434, 436.)

On July 1, 2014, Robert Gilliland, M.D., a state agency medical consultant (SAMC), addressed Plaintiff's medically determinable impairments. (*Id*. at 84-86.) He opined that Plaintiff had only mild restrictions in activities of daily living, and only mild difficulties in maintaining concentration, persistence, or pace. (*Id*. at 85.) Plaintiff had no difficulties in maintaining social functioning, and that he had one or two episodes of decompensation. (*Id*.) He found that Plaintiff's alleged disabling limitations were partially supported by the evidence of record. (*Id*. at 86.)

On July 2, 2014, Plaintiff was seen at Parkland again, and it was suspected that he was non-compliant with his medication. (*Id*. at 450.) He was counseled extensively on how to take his insulin. (*Id*. at 451.) He had gained 30 pounds and had numbness or burning in his feet or legs. (*Id*.

8

at 453.) His drug screening tests were negative for all tested drug use. (*Id*. at 458-59.)

On July 29, 2014, he returned to Parkland for treatment for his diabetes. (*Id*. at 462.) He stated that he never missed taking his medication unless he did not eat. (*Id*.) Plaintiff was educated on signs and symptoms of hypoglycemia, hyperglycemia, and the treatment of both. (*Id*. at 467.)

On September 9, 2014, Plaintiff was seen at Parkland by Robert Lorin Cantrell, M.D., for his diabetes. (*Id*. at 507.) He was alert and oriented times 3, and had a normal mood and affect. (*Id*. at 510.)

On September 12, 2014, Dr. Patel completed another psychiatric progress note for Plaintiff. (*Id*. at 431.) Plaintiff had anxiety and his affect was restricted, but he had no psychotic symptoms and no suicidal ideation. (*Id*.) He had a GAF score between 41-50. (*Id*. at 432.)

On October 24, 2014, Margaret Meyer, M.D., a state agency psychological consultant (SAPC), completed a mental residual functional capacity (RFC) assessment for Plaintiff based on the medical evidence. (*Id*. at 99-101.) She opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, and persistence, and that he had no limitations in the areas of social interaction and adaptation. (R. at 99-100.) She further opined that Plaintiff could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; interact adequately with coworkers and supervisors; and respond appropriately to changes in a routine work setting. (R. at 100.) She determined that Plaintiff's alleged limitations were not wholly supported by the evidence of record. (*Id*. at 101.)

On November 20, 2014, Plaintiff was treated at Parkland due to chronic multiple joint pain in both knees, his right hip, his right wrist, and both shoulders, which had exacerbated in the prior 6 months and was worsening. (*Id*. at 520.) The worst pain was in his left shoulder and right wrist,

and he reported that he had previously expressed concern about arthritis but had never been evaluated. (*Id.*) X-rays conducted on his right wrist showed an old fracture that had healed with a mild dorsal tilt of the distal radial articular surface. (*Id.* at 521.) X-rays on his left shoulder showed a Hill-Sachs fracture that was consistent with a prior anterior shoulder dislocation. (*Id.*)

On December 3, 2014, December 31, 2014, January 16, 2015, and January 30, 2015, Plaintiff went to Parkland for follow-up appointments for his diabetes. (*Id.* at 530, 533, 541, 552.) At his initial appointment, it was noted that he had previously experienced symptoms of hypoglycemia at least twice per week, but he'd had only had one episode of hypoglycemia since the change in his medication regimen. (*Id.* at 530.) Plaintiff also complained of joint pain. (*Id.*) He had no polyuria, polydipsia, blurred vision, temperature intolerance, nervousness, or anxiety, but he did have numbness and tingling in his feet as well has chronic numbness of his left thigh. (*Id.*) He was aware, alert, and oriented times 4, and there was no evidence of depression or anxiety. (*Id.* at 531.) His A1c level was a 9.5, and his glucose level was 289. (*Id.* at 531-32.) He was assessed with type 1 diabetes, uncontrolled, chronic joint pain, and tachycardia. (*Id.* at 532.) At his second appointment, Plaintiff was no longer having episodes of hypoglycemia, and he reported that he would treat his hypoglycemia by drinking juice. (*Id.* at 541.) He denied having anxiety but reported that he had depression. (*Id.* at 542.) At his initial January appointment, Plaintiff reported having symptoms of hypoglycemia one-to-two times per week at night. (*Id.* at 553.) At his next appointment, Plaintiff reported that he was checking his blood sugar level twice per day, and he was not hypoglycemic. (*Id.* at 572.)

On January 21, 2015, Plaintiff returned to Parkland for his diabetes and pain in his right hip down to his leg, as well as pain on the right side of his back that had been present for over a year, with pain at a 7 on the pain scale. (*Id.* at 562.) His lab test results were "ok" other than the results

for his A1c, which registered at a level 10.0. (*Id*. at 565, 568.) X-rays were conducted on his lumbosacral spine, and the bones appeared osteopenic, but no other significant acute radiographic abnormalities of the lumbar spine were seen. (*Id*. at 578.)

On September 29, 2015, Plaintiff was admitted to TRMC through the emergency room with complaints of hyperglycemia, elevated blood sugar, nausea, and vomiting. (*Id*. at 608.) He had missed his dose of insulin. (*Id*.) He was in no acute distress, alert, awake, comfortable, well-developed, well-hydrated, well-groomed, and well-nourished. (*Id*. at 613.) He was started on Lantus and hydrated very well; the following morning his blood sugar was low and he was given orange juice. (*Id*. at 608.) It was noted that he had "very brittle diabetes" that was managed carefully. (*Id*.) He was diagnosed with diabetic ketoacidosis, dehydration, and hyperglycemia. (*Id*.) He was doing better the next day and was discharged. (*Id*.)

On October 11, 2015, Plaintiff returned to TRMC complaining of a "headache and dizziness associated with myalgias and generalized weakness." (*Id*. at 626.) He was diagnosed with dizziness that was secondary to dehydration, severe hypokalemia, and uncontrolled diabetes mellitus. (*Id*.) He was placed on IV fluids and potassium replacement protocol overnight, and his electrolytes were stabilized. (*Id*.) He was discharged the following day. (*Id*.)

On January 11, 2016, Dr. Patel completed a mental impairment questionnaire for Plaintiff. (*Id*. at 649-54.) He noted his contact with Plaintiff every month for the previous five years. (*Id*. at 649.) He also noted that Plaintiff's current GAF score of 35, and his highest score in the past year had been 40. (*Id*.) Plaintiff had a lack of focus, poor concentration, and poor memory recall, and his signs and symptoms included anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating,

11

recurrent and intrusive recollections of traumatic experience, psychomotor agitation or retardation, substance dependence, emotional withdrawal or isolation, easy distractibility, memory impairment, sleep disturbance, and recurrent severe panic attacks that occurred at least once per week. (*Id*. at 650.)

Dr. Patel opined that Plaintiff was either seriously limited or unable to meet competitive standards in the mental abilities and aptitudes needed to perform unskilled work. (*Id*. at 651-52.) He noted that Plaintiff did not have a low IQ or intellectual functioning, but his psychiatric condition exacerbated his experience of pain or other physical symptoms. (*Id*. at 652.) He opined that Plaintiff was markedly limited in activities of daily living and maintaining social functioning, and that he was extremely limited in maintaining concentration, persistence, or pace. (*Id*. at 653.) He also noted that Plaintiff had four or more episodes of decompensation within a 12 month period. (*Id*.) Dr. Patel reported that Plaintiff could be expected to miss more than 4 days of work per month, that his impairments lasted or could be expected to last at least 12 months, and that his alcohol or substance abuse did not contribute to his limitations. (*Id*. at 654.)

On January 18, 2016, George R. Mount, Ph.D., completed a clinical interview and mental status examination for Plaintiff. (*Id*. at 655-58.) Plaintiff was punctual, cooperative, and reliable, and he walked slowly using a cane. (*Id*. at 655.) He was sexually abused at the age of 8, and he continued to have disturbing thoughts and memories about his abuse. (*Id*.) He reported that he had problems with depression, suicidal thoughts, and a low energy level, and stated that he felt guilty, worthless, and irritable. (*Id*. at 656.) He also reported problems with concentration, and stated that he heard voices telling him he was worthless as well as other "really negative things." (*Id*.) He did not have visual hallucinations and denied drug or alcohol use. (*Id*.) Plaintiff also did not have sleep disturbance, could take care of his own personal hygiene, cook, clean, and manage his own funds,

and seldom socialized with others outside of his home. (*Id.*) His grooming was fair, behavior was lethargic, speech was slow, conversation was relevant and coherent, thought process was goal-directed, affect was depressed, mood was labile, and his fund of general knowledge and information was average. (*Id.* at 657.) He reported auditory hallucinations and was oriented times 4. (*Id.*)

Dr. Mount found that Plaintiff's remote memory was intact, recent memory was not intact, and his immediate memory was marginal. (*Id.*) He could not complete serial 7's but was able to do serial 3's, and he misspelled world backwards. (*Id.*) His judgment and reasoning were logical and functional, insight was fair, and his prognosis was guarded. (*Id.*) Testing placed Plaintiff in the severe anxiety and depression ranges, and he scored above the optimal cutoff for patients with PTSD. (*Id.*) Plaintiff's scores in his P3[2] pain patient profile for depression, anxiety, and somatization were all above average. (*Id.* at 658.) Dr. Mount's diagnostic impression was major depressive disorder that was recurrent and severe without psychotic features, adjustment disorder with anxiety, chronic PTSD, cognitive disorder, opioid dependance that was in full remission, and unspecified personality disorder. (*Id.*) His psychosocial stressors included occupational, social, health, and financial problems, and his GAF score was 43. (*Id.*)

Dr. Mount opined that based on interpretive reports, Plaintiff would not be likely to tolerate having his work judged and evaluated by a supervisor, would not benefit from a supportive workplace environment or accommodations, and could not sustain a normal workday or work week without significant interruptions from psychologically based symptoms. (*Id.* at 681.) He further opined that Plaintiff had medically determinable impairments including diabetes, cognitive impairment, major depression, PTSD, and personality disorder, which could reasonably be expected

---

[2] "The P3 was designed to identify patients who are experiencing emotional distress associated with pain as a result of disease." (R. at 602.)

to produce the symptoms that Plaintiff complained of.  (*Id.* at 682.)  He found Plaintiff to be credible.  (*Id.*)  He also found that it was reasonable to expect Plaintiff to complain that he could not sit, stand, and walk as needed to perform competitive work, to exaggerate his physical limitations to the extent that he believed he could not perform the physical demands of work, and to be absent from work 3 or more days per month due to his physical complaints and perception that he could not perform basic activities of daily living.  (*Id.* at 682-83.)

Dr. Mount also completed a mental RFC assessment for Plaintiff on January 18, 2016.  (*Id.* at 684-86.)  He opined that Plaintiff was markedly limited in his ability to understand and remember detailed instructions, but no more than moderately limited in the remaining areas of understanding and memory.  (*Id.* at 684.)  He found Plaintiff markedly limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks, but no more than moderately limited in the remaining areas of sustained concentration and persistence.  (*Id.* at 684-85.)  He further determined that Plaintiff was markedly limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation, but no more than moderately limited in the remaining areas of social interaction and adaptation.  (*Id.* at 685.)

In a letter dated November 20, 2016, Dr. Mount opined that Plaintiff was completely and

14

permanently disabled from engaging in any type of competitive employment due to both physical and psychological issues. (*Id*. at 687.)

### 3.    Hearing Testimony

On January 19, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 47-66.)  Plaintiff was represented by an attorney. (*Id*. at 49.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 24 years old, left-handed, single, and had a high school education with a couple of community college credit hours. (*Id*. at 49-51.)  He could not get a job because of the brain trauma he endured in October 2013, and his diabetes. (*Id*. at 50.)  He'd had two prior brain surgeries to clear out brain abscesses, with the last one occurring in November 2013. (*Id*. at 50-51.)  Plaintiff stated that the surgeries have made it difficult for him to concentrate and caused him to have "bad memory loss". (*Id*. at 51.)  He also had weakness on the right side of his body from a stroke, which caused his balance to be "really bad," and he had to walk with a cane because his right side was so weak. (*Id*.)  He'd had problems with his balance and walking since his last brain surgery in November 2013, and had to have physical therapy to learn how to walk again. (*Id*. at 51-52.)  He had been in counseling with Dr. Patel since he was out of the hospital. (*Id*. at 52.)  He went to group therapy for 2 hours almost every Sunday and received medication through Dr. Patel. (*Id*. at 52.)

Plaintiff stated that he'd had a history of depression since his childhood because he was diagnosed with diabetes at a young age, and he was sexually assaulted when he was 8 years old. (*Id*. at 52-53.)  He also suffered from anxiety due to post traumatic events in his life and his medical condition, and being around others increased his anxiety. (*Id*. at 53.)  He took medication for both depression and anxiety. (*Id*.)  Due to his anxiety, he was afraid to do anything other than stay home

15

and try to maintain himself, and there were things he could not physically do anymore to help with chores around the house. (*Id.* at 54.) He felt that he might die if he were to try to go to work or something similar. (*Id.*) Plaintiff was also in a lot of physical pain. (*Id.*) He had neuropathy in his feet and legs, which felt numb or as if pins were being stuck into his legs and feet; sciatica in his back, which caused a long, sharp pain down his right leg; migraines; shoulder pain; and knee pain. (*Id.*) He was dependent on others to help him get through the day and week. (*Id.* at 54-55.) He needed reminders to take his medications because he had a bad memory. (*Id.* at 55.) His grandparents helped him maintain his life, and he did not think he could live alone. (*Id.*)

In response to questioning by the ALJ, Plaintiff stated that he thought his declining health from having diabetes for 20 years was causing his physical limitations. (*Id.* at 58.) A lot of his physical limitations had to do with his mental state. (*Id.* at 59.) He could not withstand intense heat, and he could not be on his feet for very long due to his diabetes. (*Id.*)

### b.       VE's testimony

The ALJ asked the VE to consider a hypothetical individual who could perform medium, semi-skilled work, and could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; interact adequately with coworkers and supervisors; respond appropriately to changes in a routine work setting; and have only occasional contact with the public. (*Id.* at 60.) The ALJ initially asked if, when looking to the medium, semi-skilled grids, there were jobs this hypothetical individual could perform other than telemarketer. (*Id.* at 61.) The ALJ then stated the VE could provide unskilled jobs that would not include assembly line work. (*Id.*) The VE responded that the individual could work as a linen room attendant, which was a medium, unskilled job. (*Id.* at 61-62.)

Plaintiff's attorney asked the VE if the individual would be able to maintain competitive

employment if he could not report for work at least four times per month. (*Id.* at 62.) The VE responded that he would not. (*Id.*)

The ALJ then asked how long it would take to resolve the conflict with the Dictionary of Occupational Titles (DOT) based on the opinions that Plaintiff could not report for work at least four times per month. (*Id.*) The VE responded that it would only take one day to send Plaintiff for a functional capacity evaluation (FCE) to resolve the conflict. (*Id.*)

**C.    ALJ's Findings**

The ALJ issued his decision denying benefits on May 17, 2016. (*Id.* at 11-42.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 26, 2013, the application date. (*Id.* at 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: seizures, diabetes mellitus, brain injury, history of stroke, history of septum surgery, history of craniotomy, hyperglycemia, transaminitis, endocarditis, sciatica, leukocytosis somatoform disorder, unspecified neurocognitive disorder, bipolar disorder, depressive disorder, adjustment disorder, post-traumatic stress disorder, opioid dependency, brain abscesses, personality disorder NOS, and depressive personality disorder. (*Id.*) At step three, the ALJ first stated that Plaintiff met Listing 12.09, and then proceeded to find that he had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.* at 23.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift and carry 25 pounds frequently and 50 pounds occasionally; sit for 6 hours in an 8-hour workday; stand and walk for 6 hours total in an 8-hour workday; understand, remember, and carry out detailed, but not complex instructions; make decisions and accept instructions; interact adequately with others, co-workers, and supervisors; respond appropriately to changes in routine work settings; adapt to a

routine work environment; attend and concentrate for only 2-hour intervals between breaks; and sustain a full 8-hour workday. (*Id*. at 31.) The ALJ further determined that Plaintiff could have only occasional contact and interaction with other people and could not engage in fast pace, assembly line work. (*Id*.)

At step four, the ALJ determined that Plaintiff had no past relevant work.[3] (*Id*. at 41.) At step five, the ALJ found that transferability of job skills was not an issue because Plaintiff did not have any past relevant work, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform if he stopped his substance abuse. (*Id*.) Accordingly, the ALJ determined that in absence of substance abuse, Plaintiff had not been under a disability, as defined by the Social Security Act, from November 26, 2013, through April 22, 2016. (*Id*. at 42.)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

---

[3] Despite stating that Plaintiff had no past relevant work, the ALJ proceeded to find that Plaintiff did in fact have past relevant work as a fast food cook but was unable to perform at the semi-skilled level. (*See* doc. 14-1 at 41.)

18

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id.* Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

19

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1.      The Administrative Law Judge (ALJ) erred in failing to fully and fairly develop the record in this case.

2.      The ALJ improperly discounted the treating and examining source opinions of record in favor [of] non-treating, non-examining physicians.

3.      Plaintiff . . . met his burden of demonstrating an impairment or combination of impairments that met the criteria of an Appendix 1 Listing.

4.      The ALJ's step five finding is not supported by proper vocational expert

20

(VE) testimony.

(doc. 17 at 3.)

A.    **Duty to Develop the Record**

Plaintiff argues that the ALJ failed to fully develop the record by failing to order additional consultative examinations. (*Id*. at 14-17.) The Commissioner responds that the evidence in the record "was sufficient for the ALJ to make an informed decision." (doc. 20 at 8.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.' "); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

"The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006) (per curiam). An ALJ must order a consultative evaluation, however, when it is necessary to enable the ALJ to make the disability determination. *Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (per curiam)). A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment. *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam). Isolated comments without further support by a claimant are

insufficient to raise a suspicion of non-exertional impairment, however.  *See Pierre v. Sullivan*, 884 F.2d 799, 802–03 (5th Cir. 1989) (per curiam) (holding isolated comments about claimant's low intelligence insufficient to raise suspicion that claimant was mentally retarded); *Brock*, 84 F.3d at 728 (holding the claimant's references amounted to isolated comments because he did not mention non-exertional impairments in his original request for benefits, he never sought medical treatment for such impairments, and he did not mention these impairments at his hearing).  Additionally, when evidence in the record supports a conclusion that the claimant is not disabled, a consultative exam is not necessary.  *Turner*, 563 F.2d at 671; see *Pierre*, 884 F.2d at 802 ("The decision to require such an examination is within the discretion of the ALJ.").

Here, the ALJ considered a medical record that was over 400 pages long and included almost 3 years of medical records from Plaintiff's hospitalizations and surgeries; treatment notes and a mental impairment questionnaire from Plaintiff's treating physician, Dr. Patel; a mental examination by Dr. Mount; and a psychological evaluation by Dr. Brucken.  (doc. 14-1 at 244-686.)  The record also contained two different RFC assessments, one from a non-examining consultant, and one from Dr. Mount, as well as hearing testimony from Plaintiff and the VE.  (*Id*. at 47-66, 99-101, 684-86.)  Despite this record, the ALJ expressed concern throughout his decision that additional evaluations would be useful to more fully develop the record, and he noted that those "possible avenues of development . . . would add certainty to the adjudication, when available." (*Id*. at 24, 26, 30-31, 34-37, 39-40.)

The ALJ first noted that an "ALJ may request examination by a pain specialist or by a pain center" when "an assessment of the existence and extent of any limitations due to pain is essential to make a determination."  (*Id*. at 24.)  He then noted that "where the inference of [RFC] is uncertain or dilute, the ALJ may request a consultative examination by a physical therapist who can actually

measure and record the claimant's physical restrictions. The value of such examination is obvious." (*Id*. at 34.) He also stated that under 20 C.F.R. § 404.1512(e), a "treating source may be re-contacted and requested to perform a consultative examination . . . in order to 'patch the holes'" when their report "contains a conflict or ambiguity that must be resolved . . . ." (*Id*. at 36.) He did not order any of these consultative examinations, however, because he was informed in other cases that these types of consultative examinations were "not currently available and thus it would be futile for [him] to request [them]." (*Id*. at 20, 34, 36-37.)

The ALJ also recognized that "Social Security Ruling 85-16 recommends obtaining a workshop evaluation to assess a claimant's ability to understand, to carry out and remember instructions, and to respond appropriately to supervisors, coworkers, and customary work pressures in a work setting," but noted several times in his decision that a work evaluation had not been completed. (*Id*. at 26, 30-31, 34-35, 39.) He further recognized that a claimant may self-refer to the state agency to request a work evaluation, or the ALJ may request the performance of a mini-work evaluation if a source to provide evaluation and funding were available. (*Id*. at 34-35.) He then noted that "[u]nfortunately, no work evaluation ha[d] been performed and seemingly none [was] currently available." (*Id*. at 35.) He ultimately gave great weight to the disability examiner's conclusion that Plaintiff was not disabled, "tempered by the fact that [Plaintiff] was not screened-in for a full vocational assessment," and "[t]he capacity to actually perform the jobs proposed by [Disability Determination Services (DDS)] was never tested." (*Id*. at 39-40.)

If an ALJ "determines the record is insufficient or inconsistent the ALJ must try to resolve the inconsistency or insufficiency . . . and may only make a determination on an incomplete record when 'despite efforts to obtain additional evidence, the evidence is insufficient to determine whether [Plaintiff is] disabled.'" *Culpepper-Price v. Comm'r of Soc. Sec. Admin.*, No. 6:16-CV-00322-JDL,

2017 WL 3386121, at *4 (E.D. Tex. Aug. 7, 2017) (internal citations omitted) (quoting 20 C.F.R. § 416.920b).  As previously found by a court in this district, "the ALJ's discussion of the consultative examinations implies that he found them to be necessary and that he would have ordered them if he was able to do so." *Felts v. Berryhill*, No. 3:16-CV-1653-M (BF), 2017 WL 3268494, at *3 (N.D. Tex. July 3, 2017), *adopted by*, 2017 WL 3267729 (N.D. Tex. July 31, 2017). Although the ALJ indicated that the consultative examinations were unavailable, "it appears that [he] believed that the additional information was necessary to fully develop the record," and his statements indicate that the medical records before him were inadequate or that he lacked sufficient facts to make a sufficient determination. *See id.*; *see also Trobaugh v. Comm'r of Soc. Sec. Admin.*, No. 4:16CV769-KPJ, 2018 WL 1367882, at *4–5 (E.D. Tex. Mar. 16, 2018) ("the ALJ's statements undermine his own conclusions by acknowledging the need and/or potential usefulness of additional consultative examinations . . . .").

Additionally, the ALJ's statements regarding the unavailability of the examinations  "are inadequate to convince the Court that sufficient effort to develop the record was made." *Culpepper-Price*, 2017 WL 3386121, at *4; *see also Trobaugh*, 2018 WL 1367882, at *4 ("Without further explanation, the ALJ's conclusion that evaluation[s] were not available "is not convincing."). "Without identifying who told the ALJ that these requests to obtain additional evidence would be 'futile,' or even describing the similarities between this case and the other cases" that informed him that these evaluations were unavailable, "there is no way . . . to determine if the consultative examinations discussed above could or could not have been done." *Culpepper-Price*, 2017 WL 3386121, at *4; *see also Trobaugh*, 2018 WL 1367882, at *4 ("The ALJ's position that because he had not been able to obtain various evaluations in other cases or had previously been informed that examinations were not available did not relieve him of his obligation to develop the record in

Plaintiff's particular case" because he provided "no further detail, explanation, or comparative analysis regarding how these other cases and circumstances support his disability determination despite the lack of necessary and potentially useful additional information."). Moreover, it appears that it was possible for the ALJ to order an evaluation to test Plaintiff's ability to work based on his references to an ALJ's ability to order a work evaluation absent a self-referral, and the VE's testimony that it would only take one day to complete a FCE[4] for Plaintiff. (doc. 14-1 at 34-35, 62.)

Accordingly, the ALJ's failure to order the consultative examinations breached his duty to fully and fairly develop the facts relevant to Plaintiff's claim for benefits. *Carey*, 230 F.3d at 142; *Wren*, 925 F.2d at 128. Because the ALJ did not order these additional consultative examinations or explain why they were unavailable, his findings are not supported by substantial evidence. *Culpepper-Price*, 2017 WL 3386121, at *4–5 (determining that the ALJ's findings were not supported by substantial evidence where he did not order additional consultative examinations after indicating that they were necessary in the decision); *Felts*, 2017 WL 3268494, at *3 (same); *see also Trobaugh*, 2018 WL 1367882, at *5–6 ("the ALJ had a duty to do more than was done in this case to develop the record, and his conclusion that he had sufficient evidence to make the disability determination is not supported by the record.").

## B.    <u>Harmless Error</u>

Plaintiff argues that he was prejudiced by the ALJ's failure to fully develop the record because "the ALJ was forced to rely on an obviously incomplete record, and forced to 'rely upon inferences drawn from the medical and other evidence of record,' as well as having to 'play

---

[4] A FCE tests an individuals ability to perform work. *See Griffith v. Colvin*, No. 3:13CV14TSL-JMR, 2014 WL 1276521, at *3 (S.D. Miss. Mar. 27, 2014) (recognizing that a FCE determined the plaintiff's ability to perform work); *see also Bressmer v. Fed. Express Corp.*, No. 99-9225, 2000 WL 637069, at *1 n.1 (2d Cir. May 16, 2000) (citation omitted) (noting that FCE's are used to "'measure whether an individual has the ability to meet the required job demands.'").

doctor'." (doc. 17 at 17.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's failure to fully develop the record casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris*, 864 F.2d at 335).

Here, as noted, the ALJ discussed "possible avenues of development that would add certainty to the adjudication" throughout his decision. (doc. 14-1 at 40.) He specifically discounted the "the medical and other opinions of record" because there was not a work evaluation "to confirm the expectations stated therein," and he ultimately gave great weight to the disability examiner's opinion that Plaintiff was not disabled "tempered by the fact" that Plaintiff did not undergo a full vocational assessment to determine whether he could actually perform the jobs proposed by the DDS. (*Id.* at 39-40.) He also noted that a further consultative examination by Plaintiff's treating source could justify the inclusion of greater restrictions. (*Id.* at 36.) Had the ALJ ordered Plaintiff to undergo any of the noted consultative examinations, "there is the possibility that, depending on the results, the ALJ would have placed greater restrictions on [Plaintiff] . . . ." *Hopkins on Behalf of Garcia v. Berryhill*, No. 3:16-CV-2869-BK, 2018 WL 1122217, at *5 (N.D. Tex. Mar. 1, 2018); *see also*

26

*Trobaugh*, 2018 WL 1367882, at *6 ("While it cannot be known with certainty what additional consultative evidence would have established, there is evidence in the record to suggest that . . . Plaintiff may have suffered greater limitations than those accounted for in the RFC" if he underwent additional evaluations). Accordingly, the ALJ's failure to fully develop the record by ordering additional consultative examinations casts doubt as to whether substantial evidence exists to support the ALJ's finding that Plaintiff was not disabled. *See Hopkins on Behalf of Garcia*, 2018 WL 1122217, at *5; *see also Trobaugh*, 2018 WL 1367882, at *6 (finding that the plaintiff "was prejudiced due to the ALJ's failure to fully develop the record."); *Thornhill v. Colvin*, No. 14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Dec. 15, 2014) (finding prejudice "where the ALJ could have obtained evidence that might have changed the result"), *adopted by*, 2015 WL 232844 (N.D. Tex. Jan. 16, 2015).[5]

## IV.    RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED**, on this 31st day of January, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[5] Because this error requires remand, and further development of the record may affect the remaining issues, it is unnecessary to reach those issues.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

28